[Cite as *State v. Peterson*, 2018-Ohio-3893.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JOHN J. PETERSON,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 16 MO 0011**

---

Criminal Appeal from the
Court of Common Pleas of Monroe County, Ohio
Case No. 2015-166

**BEFORE:**
Kathleen Bartlett, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
AFFIRMED

---

*Atty. James Peters,* 101 North Main Street, Room 15, Woodsfield, Ohio, 43793, for
Appellee and

*Attys. Craig Jaquith and Timothy Young*, 250 East Broad Street, Suite 1400, Columbus,
Ohio, 43215, for Appellant.

Dated: September 25, 2016

**BARTLETT, J.**

{¶1} Appellant, John J. Peterson appeals his jury convictions in the Monroe County Court of Common Pleas for one count of rape, in violation of R.C. 2907.02(A)(1)(b)(child under the age of thirteen), a felony of the first degree (count one); three counts of rape, in violation of R.C. 2907.02(A)(2)(rape by force or threat of force), felonies of the first degree (counts eleven, twelve, and thirteen); three counts of attempted rape, in violation of R.C. 2923.02, felonies of the second degree (counts two, three, and nine); one count of gross sexual imposition, in violation of R.C. 2907.05(A)(4)(child under the age of thirteen), a felony of the third degree (count four); three counts of gross sexual imposition (by force or threat of force), in violation of R.C. 2907.05(A)(1), felonies of the third degree (counts seven, eight, and fourteen; and two counts of endangering children, in violation of R.C. 2919.22(B)(2), felonies of the third degree (counts five and six). One count of rape, a violation of R.C. 2907.02(A)(2)(by force or threat of force), a felony of the first degree, was dismissed upon oral motion by the state due to lack of evidence at the conclusion of its case (count ten).

{¶2} The trial court imposed a mandatory life sentence for the rape of a child under the age of thirteen conviction, plus eleven years each for the remaining three rape convictions, eight years each for the three attempted rape convictions, sixty months for the gross sexual imposition involving a child under the age of thirteen conviction, eighteen months each for the remaining three gross sexual imposition ("GSI") convictions, and thirty-six months each for the two endangering children convictions. All of the sentences were imposed to run consecutively for an aggregate sentence of life plus seventy-two and a half years.

{¶3} Appellant's victims were the daughters of his fiancé, Patricia, T.N. and C.N. (D.O.B.s 2/7/97 and 7/17/98, respectively), who were in their early-to-mid teens, and Patricia's niece S.N. (12/5/03) and nephew J.N. (5/24/05), of whom Patricia had custody, who were under the age of thirteen, at all times relevant to the indictment. The crimes occurred during the twenty-five-month period between January 1, 2012 and January 31, 2015. Appellant shared a home with his victims.

**{¶4}** Appellant and Patricia share two children who also resided in the home, a son, J.P. and a daughter, B.P., who were in their early-to-mid teens at all times relevant to the indictment. No allegations of abuse were asserted by Appellant's biological children, who testified for the defense at trial.

**{¶5}** In this appeal, Appellant contends that his due process rights were violated when the trial court denied his motion to sever the case by victims, and when it refused to conduct competency evaluations of the pre-teen victims, who suffered from developmental disabilities. Finally, Appellant contends that he was provided ineffective assistance of counsel, because his trial counsel elicited testimony from S.N. on cross-examination that established the essential elements of the gross sexual imposition conviction in count four, after the prosecutor failed to establish the elements on direct examination. For the following reasons, Appellant's convictions are affirmed.

I.     Facts and Procedural History

**{¶6}** Lisa Swisher, a supervisor for the Monroe County Department of Job and Family Services ("MCDJFS"), testified that Patricia contacted MCDJFS in September of 2014 to request assistance with housekeeping. (Trial Tr. I, 260-261). It was the second time that Patricia requested help from the agency regarding the habitability of the home. Swisher described the home as filthy, the carpets were matted and dirty, the pets were neglected, there was food strewn about the house, and the home and refrigerator were infested with roaches. (Tr. I 267-268.)

**{¶7}** Based upon the condition of the home, Swisher began making regular visits to Patricia's residence. In late October, a complaint was filed in Juvenile Court after Swisher discovered multiple bruises on S.N. and a gash on the back of her head. S.N. told Swisher that Appellant had attempted to grab her while he was reprimanding her and she fell back onto a bannister or doorframe. (Tr. I 269-270). Because concerns had been raised in the past regarding physical abuse at the residence, (Tr. I 297), and based upon admissions made by Appellant and Patricia, an Order for Protective Supervision and case plan were issued by the Court. (Tr. I 270-271).

**{¶8}** Roughly three months later, S.N. and J.N. were placed in foster care following a January 31, 2015 incident in which T.N., in an effort to control S.N.'s misbehavior, duct taped S.N.'s hands, feet, and mouth. (Tr. I 273-274, Tr. II 20). S.N.

freed herself and fled to a neighbor's home.  (Tr. II 42).

{¶9}    While being questioned about the January 31, 2015 incident, K.T., a 10-year-old neighbor and frequent visitor to Patricia's home, disclosed that she had witnessed Appellant physically abuse S.N. and J.N. (Tr. I 274.)  K.T. testified at trial that she witnessed Appellant grab S.N. and J.N. by the throats and release them only after their faces turned red. (Tr. II, 20-21).

{¶10}    K.T. further reported that Appellant commonly punished S.N. and J.N. by making them perform push-ups and sit-ups, and stand on the stairs.  (Tr. II 20-25).  None of the other children were punished in this fashion.  (Tr. II 37-38.)   K.T. testified that Appellant also withheld food, which caused S.N. and J.N. to steal food during the night. (Tr. II 27).

{¶11}    S.N. told the case worker assigned to the January 31, 2015 incident that her front tooth was chipped because Appellant kicked a waste can at her, which struck her in the mouth.  (Tr. II 56-57).  Although S.N. refused to be photographed that day, photographs were taken of J.N. documenting bruising all over his body and a large sore on his mouth. J.N. also had a sticky film around his ankles.  He suffered from bug bites and ringworm.  Both children had lice. (Tr. 57-62.)

{¶12}    S.N and J.N. were placed through a therapeutic foster care network called the House of Samuel.  (Tr. I 275).  As part of the foster care program, the children attended counseling sessions. When a family visit was being arranged in April of 2015, S.N. disclosed to Swisher that Appellant regularly hit, kicked, and punched her and J.N. S.N. further disclosed that Appellant had kicked her in a "bad place" and it bled.  (Tr. 276).

{¶13}    A few days later, S.N.'s counselor at House of Samuel contacted Swisher and told her that S.N. had additional information to disclose about Appellant.  S.N. told Swisher that Appellant had been sexually molesting her in the basement of their home. (Tr. 277-278).  Around that same time, S.N. disclosed Appellant's physical and sexual abuse to her fifth grade teacher, M.W. (Tr. 281-283). In a letter to Swisher, M.W. documented S.N.'s allegations of abuse, in particular that Appellant had choked her and J.N. in the kitchen until they fainted.  S.N. alleged that Patricia found them lying on the kitchen floor.  S.N. further alleged that Appellant threatened to stab her if she reported

the abuse.  (4/9/15 M.W. Letter, p. 1.)

{¶14} Sexual abuse interviews were scheduled for S.N. and J.N. at Harmony House, a child advocacy center that performs forensic interviews with children to reveal physical and sexual abuse.  (Tr. 278-279).  Leslie Vassilaros, the founder and executive director of Harmony House, and a child forensic interviewer, conducted S.N.'s interview on April 9, 2015.  Vassilaros authenticated a video recording of the interview that was played for the jury and admitted into evidence.

{¶15} During the interview, S.N. described repeated instances of molestation, including oral sex (count one), attempted anal and vaginal sex (counts two and three), and Appellant's attempt to suck and bite her breasts (GSI - count four).  She told Vassilaros that Appellant began molesting her when she was ten years of age, and that it happened more than twenty times.  S.N. described Appellant's penis in her mouth, and that it tasted like "pee."  She drew a picture of herself performing oral sex on an anatomical illustration of a man that she labeled "Uncle John." She also drew a picture of herself and Appellant lying on the basement floor surrounded by dirty clothes. (State's Ex. 13.)  S.N. recounted an occasion when she was being molested by Appellant in the basement and she cried out for Patricia.  Appellant told S.N. to put her clothes on immediately.  When Patricia and T.N. entered the basement, they witnessed Appellant and S.N. without clothing.  S.N. said that Patricia told her to "get away from [Appellant]" because he was naked.  S.N. also told Vassilaros that Appellant kicked her in the vagina and that it bled, and that he withheld food as punishment (endangering children - count four).

{¶16} Robert Scott Steele, a child forensic interviewer employed by Harmony House, testified that he interviewed J.N. on April 9, 2015.  (Tr. II 174).  J.N. stated that Appellant made J.N. and S.N. perform push-ups as punishment, and that he put his foot on the children's backs.  Only J.N. and S.N. were disciplined in this manner.  (Tr. II 181).  J.N. further stated that Appellant hit him on the buttocks with a paddle and belt buckle.  (Tr. II 181-182).  Appellant once grabbed J.N. and S.N. by the throats until their faces turned red and did not release them until Patricia said "that's enough." J.N. stated that he could not breathe when Appellant grabbed him by the throat (endangering children - count five).  (Tr. II 182-183).

{¶17} Deputy Michael Russell testified that he interviewed Appellant and Patricia separately on April 10, 2015. (Tr. II 76.) Patricia reported that Appellant looked at her then-16 and 18 year-old daughters inappropriately, and placed his hands on their buttocks when he embraced them. When T.N. and C.N. wore low-cut shirts, Appellant leered at them. (Tr. II 77-78). Despite these disclosures, Patricia denied witnessing any sexual acts. (Tr. II 78).

{¶18} Appellant likewise denied any criminal conduct, but conceded that S.N. was sitting on his lap one day and called him a "pervert." (Tr. II 86.) Appellant stated in the interview that J.N. had told him and Patricia that S.N. was "messing with [J.N.]" (Tr. II 89). When Deputy Russell and Swisher, who was participating in the interview, left the room, Appellant blurted out, "I knew this was going to happen. Why does she do this stuff? Lord. . . Lord. . . ." (Tr. II 92).

{¶19} A few days later, Patricia's children were interviewed. T.N. disclosed that Appellant had touched her breasts and buttocks (GSI – counts seven and eight). Despite the fact that Appellant had yet to be removed from the residence, T.N. chose to return home rather than go to a shelter. (Tr. I 311-312). T.N. wrote that she did not want Appellant to be arrested, she just wanted him to stop the inappropriate touching. (Def. ex. E.) C.N. and Appellant's biological children denied any criminal conduct had occurred. (Tr. I 289.)

{¶20} Appellant was arrested three days later on April 16, 2015. (Tr. 289). He never returned to Patricia's home. Appellant was interviewed a second time on the day of his arrest but the video recording of the second interview was mistakenly destroyed. (Tr. II 80-83). Deputy Russell testified that he informed Appellant that T.N. had accused him of touching her inappropriately, and Appellant conceded that he had touched T.N.'s breasts and buttocks. (Tr. II 109).

{¶21} With Appellant in custody, C.N. disclosed on April 17, 2015 that Appellant had forced her to perform oral and vaginal sex (counts twelve and thirteen). She further disclosed that Appellant touched her breasts and buttocks (count fourteen). (Tr. II 111-112.)

{¶22} At trial, J.N. denied any physical abuse. He testified that Appellant spanked him when he misbehaved and grounded him when he stole food in the middle

of the night. (Tr. III 61, 66). J.N. responded affirmatively when he was asked whether Appellant had "been mean to [him] in any way," but gave as an example that Appellant "wouldn't let [him] play." (Tr. III 60). J.N. testified that Appellant gave him enough food, (Tr. II 65), and did not ever make him perform push-ups. (Tr. III 60-61). Although J.N. testified that he remembered telling the prosecutor that Appellant had grabbed his throat, the prosecutor did not continue that line of questioning. (Tr. III 62).

{¶23} S.N. refused to identify Appellant at trial. She claimed that she did not recognize him. (Tr. III 72-74). S.N. testified that she did not like the way that Appellant touched her. During her testimony, she used the term "vagina" to refer to both the female and male reproductive organs. (Tr. III 82). S.N. used anatomical illustrations to describe the sexual abuse committed by Appellant. She testified that Appellant tried to put his "vagina" in her mouth and that it went in her mouth. He did it "like every night" when everyone else was in bed. (Tr. III 86). S.N. further testified that Appellant tried to put his "vagina" in her "back" and her "front." (Tr. III 87-88). The molestation occurred in the basement. (Tr. III 89). When asked whether she and J.N. ever "[got] in trouble" at the house, S.N. responded, "Not really." However, she testified that Appellant duct taped her at night. (Tr. III 90.)

{¶24} The state did not elicit any direct testimony regarding the gross sexual imposition charge in count four, described in the bill of particulars as Appellant sucking and biting S.N's breasts. On cross-examination, defense counsel asked S.N. if Appellant ever attempted to suck any of her body parts. She responded "yes," but could not identify a specific body part. Defense counsel then asked if she remembered Appellant trying to do it or doing it. She testified that she remembered him trying to do it. (Tr. III 104). S.N. testified that that she did not remember telling Swisher that Appellant kicked her in her "private." She also did not remember telling Swisher that she called out to Patricia on one occasion when Appellant was molesting her, that Patricia and T.N. intervened, and that Patricia told Appellant to "get away" from S.N. (Tr. III 104-106).

{¶25} T.N. conceded at trial that she withheld information regarding the degree of her own molestation when she was interviewed by the police, following S.N.'s disclosures. T.N. admitted during the police interview that Appellant grabbed her under

her clothing but did not divulge that he had been raping her on a consistent basis since her fifteenth birthday. (Tr. III 124-127). Appellant began by touching and grabbing her, but graduated quickly to vaginal rape (counts nine (attempted rape) and ten (rape)). T.N. testified that Appellant raped her approximately 200 times. (Tr. III 129). She further testified that Patricia interrupted Appellant on one occasion when he was molesting T.N, and that Patricia took Appellant downstairs and they argued. (Tr. III 130).

{¶26} T.N. chose not to go to a shelter after her initial disclosure because she was afraid for the other children with Appellant still in the home. (Tr. III 124-125). She denied witnessing Appellant molesting S.N. in the basement. (Tr. III 132). However, both C.N. and T.N. testified that Appellant and S.N. spent time together after everyone else went to their bedrooms. (Tr. III 31-32, 141).

{¶27} T.N. testified that S.N. and J.N. were punished more harshly than the other children. S.N. and J.N. were forced to perform push-ups and sit-ups, and stand on the steps for an hour or longer with their arms extended out and to the sides. Sometimes the children would be permitted to use the bathroom while standing on the steps, other times they would urinate in their pants. (Tr. III 115-117). Food was commonly withheld from S.N. and J.N. as punishment. (Tr. III 119).

{¶28} C.N. also admitted at trial that she withheld information about Appellant's abuse during her police interview prior to Appellant's arrest. C.N. was afraid to accuse Appellant because he told the family that if anything were to happen to him, he would "have a bunch of bikers at the house," and the family would be "taken care of." (Tr. III 19.) C.N. testified that Appellant would take her to the basement under the guise of doing laundry then orally or vaginally rape her. He also grabbed her breasts and buttocks. She testified that it happened once every couple of days. (Tr. III 20-24). Appellant was always concerned that everyone was in bed in order to avoid detection. (Tr. III 25). C.N. testified that Appellant told her that Patricia caught him with T.N. (Tr. III 25).

{¶29} C.N. testified that Appellant regularly disciplined S.N. and J.N. by making them perform push-ups or stand on the stairs for hours. He would not permit them to use the restroom while on the steps. Appellant slapped S.N. and J.N. with an open hand on the face and buttocks. (Tr. III 11-14.) He withheld food. (Tr. III 18). C.N.

testified that Appellant grabbed the children by the throats on multiple occasions. (Tr. III 11-12).

{¶30} C.N. was conflicted about offering testimony against Appellant. Before the trial, she told Appellant that she did not want him to go to prison and that she would miss him if he did not live at the house. C.N. testified that she still cares for Appellant. (Tr. III 30, 34-35, 37, 51).

{¶31} Patricia testified that Appellant regularly forced S.N. and T.N. to stand on the steps or stare at the wall all day to punish them for misbehavior. They were made to stand with their arms out and their palms up. He also made them perform "fingertip push-ups," up to 50 at a time. She recalled one occasion when he put his foot on their backs. Sometimes Appellant would allow them to use the restroom during punishment, other times J.N. urinated in his pants. Patricia conceded that other children were not disciplined in this manner. (Tr. III 151-156 ).

{¶32} Patricia testified that she suffered from headaches, sleeplessness, anxiety and depression, and that she was prescribed sleeping pills. She further testified that Appellant encouraged her to take the sleeping pills each night sometimes as early as 8:00 p.m. (Tr. III 162-163). She explained that she did not intercede on the children's behalf when Appellant was angry because he threatened to take his biological children and she would never see them again. He also cautioned her and the children that if anything happened to him "he could have bikers pull up and different things like that." (Tr. III 153-154.)

{¶33} Patricia conceded that she found T.N. and Appellant together and T.N. was crying, but Patricia testified that both T.N. and Appellant denied that anything sexual had transpired. Patricia denied finding S.N. and J.N. passed out on the kitchen floor, finding Appellant and S.N. naked in the basement, or seeing Appellant choke S.N. and J.N. (Tr. III 165, 168).

{¶34} Appellant testified at trial and denied any criminal conduct. (Tr. IV 125-127). His father and biological daughter from a previous relationship, and his biological son and daughter with Patricia, J.P. and B.P. testified on his behalf. They all testified that Appellant displayed fatherly affection for the other children and that the other children responded in kind.

Case No. 16 MO 0011

{¶35} J.P. testified that he had recorded S.N. with his mobile phone a week before the trial saying that Appellant had "never physically messed with her." (Tr. IV 44.) J.P. was unable to produce the alleged recording.

{¶36} B.P. testified that S.N. told her that Appellant had never touched her and that she lied about him in order to get attention. (Tr. IV 58-59). B.P. explained that the children were home-schooled and that the push-ups and sit-ups were part of their gym class. She conceded that standing in one position was a form of punishment but asserted that the punishment was only imposed for ten or fifteen minutes. (Tr. IV 62-63).

{¶37} Karen Lawrence, S.N.'s foster parent, testified that she submitted monthly progress reports for House of Samuel while she fostered S.N. The progress reports document that S.N. frequently lied to Lawrence. (Tr. IV 111-116). Lawrence testified at trial that S.N. lies, "but she also comes around and tells the truth eventually." (Tr. IV 112.)

{¶38} Carol Beazel, Ph.D., a counselor who provides independent services to House of Samuel, interviewed S.N. on February 23, 2015. (Tr. IV 69-70). Appellant offered Beazel's testimony in order to authenticate a written report in which she attributed deceitfulness and a diminished ability to think/concentrate to S.N. (Tr. IV 70-71). Beazel clarified that deceitfulness and a diminished ability to think/concentrate were reported prior to the interview and were not part of her assessment of S.N. (Tr. IV 75). She attributed those problems to S.N.'s victimization and trauma.

{¶39} Beazel testified that S.N., like most children her age, lied in order to avoid punishment, but would eventually admit to her wrongdoing. (Tr IV 88). Beazel explained that S.N. lied about enuresis (bed-wetting) and stealing food. Enuresis is a common problem for children that have been sexually abused. Likewise, stealing food was typical among children from whom food had been withheld in the past. Both S.N. and J.N. suffered from these problems. (Tr. IV 88-91). Beazel testified that the children's difficulties improved while in foster care, but admitted on cross-examination that Lawrence's reports indicate S.N. struggled with deceitfulness throughout her time with Lawrence. (Tr. IV 91-105).

{¶40} During 2015 and the early months of 2016, MCDJFS assisted Patricia in removing the animals and the refuse from the home, paid for extermination services,

and replaced the furniture. S.N. and J.N. were returned to Patricia's home in March or April of 2016, roughly six months prior to the trial. (Tr. I 290).

II.    Analysis

**{¶41}** Appellant advanced three assignments of error. In his first assignment of error, Appellant asserts:

The trial court denied John Peterson a fair trial and due process of law when it allowed a joint trial of four separate victims. (Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 10 and 16, of the Ohio Constitution; July 29, 2015 Pretrial Motion Hearing Transcript; August 24, 2015 Judgment Entry.

**{¶42}** Crim.R. 8(A) reads in its entirety:

Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

"Joinder conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Thomas*, 61 Ohio St.2d 223, 225, 400 N.E.2d 401 (1980).

**{¶43}** However, upon an affirmative demonstration of prejudice, an accused may move to sever pursuant to Crim.R. 14. *State v. Wiles*, 59 Ohio St.3d 71, 76-77, 571 N.E.2d 97 (1991), citing *State v. Roberts*, 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980). "A defendant must show clear, manifest and undue prejudice and violation of a substantive right resulting from failure to sever. * * *.' " *State v. Bundy*, 7th Dist. No. 02 CA 211, 2005-Ohio-3310, ¶ 54, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 89, 564 N.E.2d 54 (1990). "Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, * * * but it is otherwise when the evidence is direct

and uncomplicated and can reasonably be separated as to each offense." *State v. Torres*, 66 Ohio St.2d 340, 343–344, 421 N.E.2d 1288 (1981).

**{¶44}** To prevail on his claim that the trial court erred in denying his motion to sever, Appellant has the burden of demonstrating three facts: (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. *State v. Schaim*, 65 Ohio St.3d 51, 59, 1992-Ohio-31, 600 N.E.2d 661, citing *Torres*, syllabus.

**{¶45}** The analysis begins with a determination as to whether Appellant's rights were prejudiced. A reviewing court must decide "(1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *Schaim*, citing *State v. Hamblin*, 37 Ohio St.3d 153, 158-159, 524 N.E.2d 476 (1988). If the evidence of other crimes would be admissible at separate trials, any prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials, and a court need not inquire further. *Id.*

**{¶46}** "The admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment." *Schaim*, citing *Curry* at 68. However, R.C. 2945.59, captioned "Proof of defendant's motive," reads, in its entirety:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

Case No. 16 MO 0011

**{¶47}** Further, pursuant to Evid. R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). "Because R.C. 2945.59 and Evid.R. 404(B) codify an exception to the common law with respect to evidence of other acts of wrongdoing, they must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom*, 40 Ohio St.3d 277, 281-82, 533 N.E.2d 682 (1988).

**{¶48}** Finally, evidence which is intrinsic to the crime being tried or helps prove an element of the offense such as intent is not barred. See *State v. Smith*, 49 Ohio St.3d 137, 139-140, 551 N.E.2d 190 (1990). Evidence of other acts is admissible if it is so connected with the offense that proof of one incidentally involves the other, it explains the circumstances of the offense, or it logically tends to prove an element of the offense*. State v. Roe*, 41 Ohio St.3d 18, 23, 535 N.E.2d 1351 (1989). A court can admit evidence of other acts which form the immediate background of and which are inextricably related to an act which forms the foundation of the charged offense. *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994).

**{¶49}** When the joinder issue is properly preserved for appeal, the defendant must demonstrate that the trial court abused its discretion in denying severance. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29. However, where, as here, a defendant does not renew a motion to sever at the close of the state's case or at the conclusion of all the evidence, appellate review is limited to plain error. *State v. Woods*, 7th Dist. No. 94-CA-129, 1998 WL 544511. Plain error is found only in the exceptional case where the error has determined the outcome and resulted in a miscarriage of justice. *State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332, syllabus (1983); *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus (1978).

**{¶50}** Turning to the issue of prejudice, we find that the evidence of the other crimes would have been admissible if the counts were severed. The testimony of S.N., T.N., and C.N. establish a scheme, plan, or system. Appellant's crimes against each

victim occurred under the same roof and during the same time period. Although the counts relating to the girls begin at different times, T.N. and C.N. testified that the molestation continued until approximately one month prior to Appellant's arrest, while the criminal conduct with S.N. is charged up to the day that she and J.N. were removed from the home. (Tr. III 21-22, 129-130).

**{¶51}** Each victim testified that Appellant initiated physical contact with inappropriate touching, which was corroborated by Patricia's testimony, and that the groping evolved over time into rape and/or attempted rape. The testimony of S.N., T.N. and C.N. established that Appellant employed a common location and method, that is, he took the girls to the basement after the other members of the household retired to their rooms each evening. Further, Appellant relied upon the same threats of violence and injury to prevent the girls from disclosing his abuse.

**{¶52}** In the alternative, we find that the evidence in this case is separate and distinct. The state charged a single incidence of each crime as to each victim (S.N. – oral rape, attempted anal rape, attempted vaginal rape; T.N. – GSI/grabbing buttocks, GSI/grabbing breasts, attempted vaginal rape, vaginal rape; C.N. – oral rape, vaginal rape, GSI/grabbing breasts and buttocks). Although the girls testified that they were repeatedly molested, their testimony was sufficient to prove at least one incidence of each crime alleged.

**{¶53}** Further, the victims were easily distinguishable. S.N. was substantially younger that the other two victims. Although T.N. and C.N. were sisters and close in age, the fact that T.N. divulged the inappropriate touching during her police interview, but C.N. withheld all information, made them easily distinguishable.

**{¶54}** Appellant contends that this case is on all fours with *State v. Quinones*, 11th Dist. No. 2003-L-015, 2005-Ohio-6576. In that case, the defendant was convicted of four counts of gross sexual imposition involving his nine-year-old granddaughter and the eight-year-old daughter of a previous girlfriend. He was originally charged with one count of rape and two counts of gross sexual imposition. He was acquitted on the sole count of rape, but the jury convicted him instead of the lesser-included offense of gross sexual imposition. The conduct occurred in 1999 to 2000 with respect to one victim and 2000 to 2001 with respect to the other, in different households.

{¶55} The Eleventh District concluded that the trial court committed plain error when it failed to hold separate trials because the alleged sexual abuse of each victim occurred "at a wholly different time period and involved a separate set of circumstances," and, therefore, the other acts evidence would not have been admissible in separate trials. *Id.* ¶ 47. The Eleventh District specifically found that there was "no pattern of abuse or relationship to the offenses that would permit the overlapping of the evidence." *Id.* The Eleventh District further concluded that the evidence relating to each victim could easily be conflated with the evidence relating to the other.

{¶56} The same is not true here. As previously stated, Appellant's crimes occurred under the same roof, during overlapping time periods, and involved a similar method and location, as well as the use of threats of violence to prevent his victims from disclosing the molestation. A clear plan or scheme emerged based upon the evidence offered at trial. Moreover, the evidence relating to each victim was easily discernable. Although the pattern of abuse was strikingly similar with each girl, their distinguishing features, S.N.'s age, T.N's limited disclosure to the police and C.N.'s complete denial during the police interview, set them apart at trial. Insofar as this case is factually distinct from *Quinones*, Appellant's reliance on that case is unwarranted.

{¶57} Even assuming arguendo that the trial court erred in denying the motion to sever, we find that joinder of the charges in this case was neither outcome determinative nor resulted in a miscarriage of justice. Both C.N. and T.N. provided compelling testimony at trial. The veracity of their testimony was bolstered by their admitted affinity for Appellant and their reluctance to play a role in his incarceration. T.N. plainly stated in her police interview that she did not want Appellant to be arrested, she only wanted the molestation to stop. Likewise, C.N. testified at trial that she told Appellant that she did not want him to go to prison and that that she still cared for him. S.N., in her Harmony House interview, provided equally compelling testimony, underscored by her self-portrait performing oral sex on Appellant. There is little doubt that Appellant would have been convicted of the charged conduct relating to each of the girls in separate trials. In addition to the girls' individual testimony, Patricia corroborated the inappropriate touching committed in plain view and added that Appellant encouraged her to take her sleeping pills every evening. Further, T.N. and C.N.

confirmed that Appellant and S.N. were frequently together when the other members of the household were asleep.

**{¶58}** In summary, we find that the evidence of other crimes in this case would have been admissible even if the counts were severed, and, in the alternative, that the evidence of each crime was simple and distinct. Even assuming arguendo that the trial court erred in denying the motion to sever, we conclude that this case is not an exceptional case where the error has determined the outcome and resulted in a miscarriage of justice. Accordingly, we find that Appellant's first assignment of error does not have merit.

**{¶59}** In his second assignment of error, Appellant asserts:

The trial court denied John Peterson a fair trial and due process of law when it refused to evaluate S.N. and J.N despite evidence presented before trial that raised serious questions regarding their competency to testify. (Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 10 and 16, of the Ohio Constitution; Crim. R. 31(A); December 14, 2015 Motion for Competency Evaluation and Hearing; January 28, 2016 Notice of Filing, Exhs. A-D.

**{¶60}** Appellant filed a motion pursuant to Evid.R. 601 for psychiatric/psychological and neurological evaluations to be performed on S.N. and J.N. and for a hearing. Appellant argued that the children's competency to provide testimony was in question because S.N. and J.N. were undergoing counseling and both children had made claims that were either contradicted by adult witnesses or impossible to believe. S.N. had reported that Patricia saw Appellant molesting S.N. and that Patricia had found S.N. and T.N. unconscious on the kitchen floor after Appellant choked them. Patricia denied both claims. J.N. had told a series of fantastical lies about S.N. killing cats and J.N. having a snake in his bed and a horse in his backyard. (12/14/15 Mot. For Competency Eval., p. 2-3).

**{¶61}** Appellant filed two supplements to the motion, which included portions of school records of S.N. and J.N. In addition, joint records were filed that consisted of Vassilaros' expert report and a DVD of the Harmony House interviews of S.N. and J.N.

Case No. 16 MO 0011

The interview of J.N. is not in the record. The trial court overruled the motion citing "the records produced under seal" and the interviews of S.N. and J.N. (4/13/16 J.E.) Although it appears that the material filed under seal is not in the record, Appellee states in its appellate brief that the material filed under seal was the Vassilaros expert report and the Harmony House DVD.

{¶62} S.N. and J.N. were over the age of ten when they testified. R.C. 2317.01, captioned "Competent witnesses," reads, in its entirety:

> All persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly.
>
> In a hearing in an abuse, neglect, or dependency case, any examination made by the court to determine whether a child is a competent witness shall be conducted by the court in an office or room other than a courtroom or hearing room, shall be conducted in the presence of only those individuals considered necessary by the court for the conduct of the examination or the well-being of the child, and shall be conducted with a court reporter present. The court may allow the prosecutor, guardian ad litem, or attorney for any party to submit questions for use by the court in determining whether the child is a competent witness.
>
> Evid.R. 601, captioned, "General rule of competency," reads, in pertinent part:
>
> Every person is competent to be a witness except:
>
> (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly.
>
> "Under the plain meaning of Evid.R. 601(A), a child witness who is ten years of age or older at the time of trial, but who was under the age of ten at the time an incident in question occurred, is presumed competent to testify about the event." *State v.*

*Groves*, 7th Dist. No. 853, 2002-Ohio-5245, ¶ 12, quoting *State v. Clark*, 71 Ohio St.3d 466, 644 N.E.2d 331 (1994), paragraph one of the syllabus. However, a trial court, in its discretion, may choose to conduct a voir dire examination of a child witness who is ten years of age or older if the judge has reason to question the child's competency. *Id.*, citing *Clark* at paragraph two of the syllabus.

{¶63} The party challenging the competence of a child ten years or older bears the burden of demonstrating the child's incompetence to testify. Groves ¶ 16. When the issue is properly preserved for trial, a trial court's decision on the competency of a witness will not be disturbed absent an abuse of discretion. *Id.* ¶ 12 citing Clark at 469. However, Appellant did not renew his objection to the children's competency at trial, and, as a consequence, we review the trial court's failure to voir dire the children for plain error. Groves ¶ 10.

{¶64} Trial courts apply the test announced in *State v. Frazier*, 61 Ohio St.3d 247, 574 N.E.2d 483 (1991), certiorari denied (1992), 503 U.S. 941, 112 S.Ct. 1488, 117 L.Ed.2d 629, to determine whether a child under the age of ten is competent to testify. Under this test, the trial court must take in to consideration the following factors: the child's ability to receive accurate impressions of fact; the child's ability to recollect those impressions; the child's ability to communicate what is observed; the child's understanding of truth and falsity; and, the child's appreciation of his or her responsibility to tell the truth. *Frazier,* syllabus. We have applied the *Frazier* test in at least one case where the child was ten years of age or older but the defendant nonetheless challenged the child's competency to testify. *Groves*, supra.

{¶65} Cognitive and behavioral assessments prepared for the purposes of J.N. and S.N.'s school district were included in the supplement to the motion for competency evaluation. According to an Individual Evaluator Assessment completed on June 13, 2011, J.N. was diagnosed with developmental delay and scored extremely low on the Wechsler Intelligence Scale for Children - Fourth Edition ("WISC-IV"). He demonstrated extremely poor articulation. The Adaptive Behavior Assessment System – Second Edition ("ABAS-II") placed J.N.'s adaptive behavior skills in the low range. A 2014 evaluation establishes that J.N. was diagnosed with Intellectual Deficit.

{¶66} Contrary to the state's assertion in its appellate brief, J.N.'s Harmony

House interview is not in the record. However, even assuming arguendo that J.N. was not competent to testify, his testimony did not inculpate Appellant. J.N. testified that Appellant punished him only when he misbehaved but Appellant did not withhold food. When asked if Appellant was mean to him, J.N. replied in the affirmative but gave as an example that Appellant would not let him play. As a consequence, Appellant cannot show that the trial court's decision to admit J.N.'s testimony was outcome determinative.

{¶67} Of equal import, testimony was offered to establish the elements of the endangering children conviction relating to J.N. by other witnesses. S.N., T.N., C.N., Patricia, and K.T. testified that Appellant was physically abusive to J.N. C.N. and K.T. witnessed Appellant choking J.N. and S.N. In other words, even assuming arguendo that Appellant was prejudiced by J.N.'s testimony, his conviction for endangering children is supported by other testimony in the record.

{¶68} According to an Evaluation Team Report dated December 20, 2012, S.N. was diagnosed with ADHD and Opposition Defiance Disorder. Her WISC-IV established a Full Scale IQ score of 45, which places her in the extremely low range of functioning. She scored in the extremely low functioning range on her ABAS-II evaluation as well. S.N. was diagnosed with a sub average IQ and three adaptive deficits.

{¶69} In addition to S.N.'s school records, Appellant cites S.N.'s use of the term "vagina" to refer to both the male and female sex organs, and her inability to recognize Appellant at trial, to establish the need for a competency hearing. Appellant also cites 56 occasions in the record where S.N. gives no audible response to questions.

{¶70} Despite her cognitive difficulties, S.N. appeared truthful in her Harmony House interview. The interview established S.N.'s ability to receive accurate impressions of fact and to recollect those impressions. Further, S.N. clearly described Appellant's behavior and illustrated their encounters. Finally, prior to offering testimony, S.N. recognized the difference between the truth and a lie, and acknowledged that she was there to tell the truth. (Tr. III 71-72).

{¶71} Vassilaros confirmed the foregoing findings in her expert report. She opined that S.N.'s statements remained consistent over the span of the Harmony House interview and were consistent with S.N.'s statements during previous interviews with a

counselor. Vassilaros further noted that S.N. was able to give spontaneous details about the allegations, including a detailed description of the basement. S.N. used developmentally appropriate language, according to Vassilaros, who concluded that S.N.'s vocabulary throughout the interview was appropriate although somewhat limited. Finally, Vassilaros opined that S.N. exhibited little motivation to fabricate her version of events and indicated that S.N. appeared to be able to distinguish between touch to the private areas to help and one for other inappropriate purposes.

**{¶72}** The trial court reviewed S.N.'s Harmony House interview and the Vassilaros report. Because there is sufficient evidence to support the trial court's decision to forego voir dire as it relates to S.N., we find no abuse of discretion. Even assuming arguendo that the trial court erred in admitting S.N.'s testimony, we find that this is not an exceptional case where the error has determined the outcome and resulted in a miscarriage of justice.

**{¶73}** Appellant likens the facts here to the facts in *In re J.M.*, 8th Dist. No. 85546, 2006-Ohio-1203. The twelve-year old accuser in that case, B.D. explained at trial that her friend Brittany was unable to accompany her to her medical examination because she had to watch her younger sisters, Maggie and Allison. When B.D. was asked for additional information about Brittany, B.D. conceded that she is an imaginary friend. *Id.* ¶ 18. B.D. characterized the term "rape" as an imaginary word. *Id.* Further, B.D. was either unable to identify the day, month, or year, or she confused them. She was unable to identify the country in which the trial was being held. *Id.* ¶ 14.

**{¶74}** B.D.'s mother explained that B.D. was previously diagnosed with schizophrenia due primarily to her multiple imaginary friends, although that diagnosis was not supported by B.D.'s current therapist. B.D. was prescribed Zoloft. Id. ¶ 19.

**{¶75}** Based upon the forgoing evidence, the Eighth District concluded that the trial court's voir dire of B.D. was insufficient. Id. ¶¶ 21-22.

**{¶76}** Although S.N. refused to identify Appellant and used the term "vagina" interchangeably at trial, the foregoing facts do not raise the same concerns as the facts in *In re J.M.* S.N. did not demonstrate any disconnection from reality, and her refusal to identify Appellant at trial is more likely the result of fear, anxiety and/or embarrassment than a break with reality. The same explanation applies to her difficulty in finding the

Case No. 16 MO 0011

anatomically-correct terms for male and female reproductive organs. Accordingly, we find that *In re J.M.* is factually distinguishable from the above-captioned case.

**{¶77}** In summary, we find that, even if the trial court erred in permitting J.N. to testify, J.N.'s testimony did not implicate Appellant, and that the elements of the endangering children conviction relating to J.N. were established by testimony from other witnesses. Next, we find that the trial court did not abuse its discretion when it permitted S.N. to testify. Despite her cognitive problems, S.N.'s Harmony House interview, coupled with Vassilaros' observations in her expert report, fulfilled the requirements of the *Frazier* test. Assuming arguendo that the trial court erred in allowing S.N. to testify, we conclude that this case is not an exceptional case where the error has determined the outcome and resulted in a miscarriage of justice. Accordingly, we find that Appellant's second assignment of error does not have merit.

**{¶78}** In his third assignment of error, Appellant asserts:

John Peterson was deprived of his constitutional right to the effective assistance of counsel. (Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution; Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Trial Tr. Vol. 3 at 70-91, 104; Trial Tr. Vol. 4 at 14).

**{¶79}** Appellant contends that he was provided ineffective assistance because his trial counsel elicited testimony regarding the elements of the gross sexual imposition charge in count four, after the state failed to elicit any testimony on direct examination. To prove ineffective assistance of counsel, the defendant must satisfy a two-prong test: first, counsel's performance has fallen below an objective standard of reasonable representation and second, Appellant was prejudiced by counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), at paragraph two of the syllabus. To demonstrate prejudice, the defendant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, paragraph three of the syllabus.

**{¶80}** In Ohio, a properly licensed attorney is presumed to be competent and the burden is on the defendant to prove otherwise. *Hamblin*, 37 Ohio St.3d at 155. In

claims of ineffective assistance of counsel, the inquiry is whether counsel acted "outside the range of professionally competent assistance." *Strickland* at 690. Further, debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, with the benefit of hindsight, it looks as if a better strategy had been available. *State v. Henderson*, 7th Dist. No. 15 MA 0137, 2018-Ohio-2816, citing *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

{¶81} First, it is important to note that the state intended to call Vassilaros at trial, and that she would authenticate the Harmony House interview of S.N. for the purpose of offering it into evidence. Vassilaros' testimony was offered by the state immediately following the testimony of the victims and Patricia. There was little doubt that S.N.'s Harmony House interview would be viewed by the jury.

{¶82} Trial counsel was aware of the accusation made by S.N. during the Harmony House interview that Appellant attempted to suck and bite S.N.'s breasts. During trial counsel's cross-examination of S.N., she was unable to identify the specific body part at issue, then she testified that Appellant did not actually suck the unspecified body part, but instead, only attempted to suck the unidentified body part. (Tr. III 104). Further, when the state attempted to rehabilitate S.N. regarding the allegations in count four, she denied that Appellant ever attempted to suck any body part. (Tr. III 109.)

{¶83} Because Appellant's defense was based on the theory that the children were lying, we conclude that trial counsel's representation fell within an objective standard of reasonableness. Trial counsel's strategy was to challenge the veracity of the children's testimony and he did so successfully with respect to the allegations of GSI in count four. S.N. was unable to identify the body part alleged in count four, and denied that the criminal conduct occurred during redirect testimony.

{¶84} Even assuming arguendo that trial counsel's cross-examination of S.N. was objectively unreasonable, we find that Appellant was not prejudiced by trial counsel's actions. Vassilaros' testimony, coupled with S.N.'s Harmony House interview, established the elements of the GSI charge alleged in count four.

{¶85} Because the Harmony House interview was going to be offered into evidence, and S.N. provided conflicting testimony regarding the allegations of GSI in count four as a result of trial counsel's cross-examination, we conclude that trial

counsel's actions fell within the reasonable range of professionally competent assistance. In the alternative, we find that Appellant was not prejudiced by trial counsel's cross-examination of S.N. Accordingly, we conclude that the third assignment of error has no merit.

III.    Conclusion

{¶86} In summary, the evidence of other crimes in this case would have been admissible even if the counts were severed, and, in the alternative, the evidence of each crime was simple and distinct. Assuming arguendo that the trial court erred in denying the motion to sever, this case is not an exceptional case where the error has determined the outcome and resulted in a miscarriage of justice.

{¶87} Next, even if the trial court erred in permitting J.N. to testify, J.N.'s testimony did not implicate Appellant, and the elements of the endangering children conviction relating to J.N. were established by testimony from other witnesses. Further, the trial court did not abuse its discretion when it permitted S.N. to testify. Despite her cognitive problems, S.N.'s Harmony House interview, coupled with Vassilaros' observations in her expert report, fulfilled the requirements of the *Frazier* test. Assuming arguendo that the trial court erred in permitting S.N. to testify, this case is not an exceptional case where the error has determined the outcome and resulted in a miscarriage of justice.

{¶88} Finally, because the Harmony House interview was going to be offered into evidence, and S.N. provided conflicting evidence regarding the allegations of GSI in count four following trial counsel's cross-examination, trial counsel's actions fell within the reasonable range of professionally competent assistance. In the alternative, Appellant was not prejudiced by trial counsel's cross-examination of S.N.

{¶89} For the foregoing reasons, all of Appellant's assignments of error are overruled and the judgment entry of the trial court is affirmed.

**Donofrio, J., concurs.**

**Waite, J., concurs.**

Case No. 16 MO 0011

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is affirmed.  Costs are waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**